1
2
3
4
5
6
7
8       IN THE UNITED STATES DISTRICT COURT

9       FOR THE NORTHERN DISTRICT OF CALIFORNIA

10
11  DEMETRIUS CONWELL,                          No. C 05-2930 MMC (PR)

12          Petitioner,                         **ORDER DENYING PETITION FOR WRIT**
                                                **OF HABEAS CORPUS**
13      v.

14  JEANNE WOODFORD, et al.,

15          Respondents
    ─────────────────────────────────────/
16

17      Before the Court is petitioner Demetrius Conwell's ("Conwell") petition for a writ of

18  habeas corpus, pursuant to 28 U.S.C. § 2254.  Respondents Jeanne Woodford and

19  Thomas L. Carey have filed an answer and supporting documents, to which Conwell has

20  replied by filing a traverse.  Having considered the papers filed in support of and in

21  opposition to the petition, the Court rules as follows.

22                          **PROCEDURAL BACKGROUND**

23      On August 3, 2001, a jury in Alameda County Superior Court convicted Conwell of

24  involuntary manslaughter with respect to the death of Daniel Spates ("Spates") and found

25  that Conwell, in the commission of the involuntary manslaughter, used a "deadly and

26  dangerous weapon, to wit: a crutch."  (See Ex. 1 at 560.)[1]  The jury also convicted a co-

27  defendant, Mario Christopher Washington ("Washington"), of voluntary manslaughter with

28
    ────────────────────
        [1]Exhibit 1 is the Clerk's Transcript, attached to respondents' answer.

respect to Spates's death.  (See Ex. 1 at 563.)[2]  On October 30, 2001, the trial court, after

conducting a bench trial, found true the allegation that Conwell had a "serious-felony/strike

prior" and "two prison-term priors."  See People v. Conwell, 2004 WL 505240, at *1 (Cal.

App. 2004).[3]  The trial court subsequently sentenced Conwell to "a total of nine years

comprised of a two-year low term for involuntary manslaughter, doubled to four for the

strike, plus five for the serious-felony prior, with terms for the weapon use and other priors

stayed."  See id. (internal citations omitted).

On March 16, 2004, the California Court of Appeal affirmed Conwell's conviction and

denied Conwell's petition for a writ of habeas corpus.  See id.  On June 23, 2004, the

California Supreme Court denied Conwell's request for review of the California Court of

Appeal's decision, (see Petition Ex. G), and, on June 8, 2005, denied Conwell's petition for

a writ of habeas corpus, (see Petition Ex. F).

## FACTUAL BACKGROUND

The following facts are derived from the Court of Appeal's March 16, 2004 decision.

Conwell, Washington, Spates and all eyewitnesses to the homicide were denizens of

Peralta Park, a recreational and lagoon-type area of Oakland featuring an estuary channel

connecting Lake Merritt to the San Francisco Bay.  Spates died after an altercation there on

a Thursday night, August 31, 2000, and his decomposing body was found floating

facedown in shallow waters of the estuary behind Laney College on the Monday morning of

September 4, 2000.

//

//

//

//

---

[2]The jury found Conwell not guilty of murder and of voluntary manslaughter, (see Ex. 1 at 555, 557), and found Washington not guilty of murder, (see Ex. 1 at 564).

[3]The California Court of Appeal's opinion is Exhibit D to the petition, and is also Exhibit 8 to the answer.

**A. Prosecution Case**[4]

    **1. Larry Cox ("Cox")**

        Cox, an unemployed resident of the park, had been treated at a hospital on August 31, 2000, and was released at 6:36 p.m. with a pair of crutches. When he got to Peralta Park later that evening, he saw Washington, Conwell, and Spates enter the park, each of whom seemed to have been drinking, and Spates was "out of control" and staggering. The trio sat with Cox at a picnic table.

        Cox testified that Washington and Conwell viciously beat up on a defenseless Spates for no good reason, beyond Washington wanting some money from him, and then rifled through his pockets before dragging him off to the estuary waters. Specifically, as they all sat at the picnic table, first discussing sports, Washington kept asking Spates, in a loud and aggressive voice, if he had any money, and Spates kept saying he didn't have any. Washington grabbed Spates by the legs, and Conwell grabbed him by an arm, and they dragged him over to a platform, where Washington threw him to the ground and kicked him hard in the head about eight times, yelling, "Get up, get up." The kicks were "sharp" and "vicious," and Spates lay on the ground, his arms up trying to cover his head. When Spates rose and staggered to a bench by Cox and sat down, Conwell punched Spates in the face a couple of times, knocking him back to the ground. Spates at some point kicked or "twitched" but was helpless. Washington administered a second set of about eight kicks to the head, and Conwell, weighing about 230 pounds, grabbed the crutch out of Cox's hand and, kneeling over Spate's supine body, put the middle part "across his throat" and pressed down hard for a minute or so, choking him. At this point Spates was not moving at all. Washington took a wallet from Spates's back pocket, went through it, tossed papers out, and threw it to the ground. Then, with Washington lifting the legs and Conwell lifting

---

[4]In addition to the witnesses and evidence discussed below, the prosecution offered the testimony of a deputy sheriff, who testified that as he helped to retrieve the body, he spotted Washington and asked him if he was aware of any disturbance, and that Washington denied having any such awareness. Additionally, the prosecution offered bank records showing Spates had withdrawn $100 from an ATM on the evening he died.

under the arms, they carried Spates toward the estuary. Spates seemed unconscious and was not moving as they carried him off. Cox walked off to his campsite to sleep. Cox had told them to stop after the crutch was used, feeling they were "most definitely" hurting Spates.

**2. Joe Johnson ("Johnson")**

Johnson was employed but living in the park. He saw Washington, Conwell and Spates leave together, saying they had to go take care of something. All three later returned and sat on the picnic table in front of him, along with others. Johnson had been drinking. A scuffle broke out. Spates, who looked drunk, was staggering around, twice reaching out to hug Washington, but Washington pushed him away, knocking him down the second time. Conwell told Spates to "chill" and told him to stay down when he fell, but Spates rose and tried this time to hug Conwell. Spates was "[o]ut of control but harmless."

Johnson described the altercation as starting with an "argument," after which Spates kept reaching out trying to hug Washington but was pushed to the ground. "They" (apparently meaning Washington) then "started putting blows on" Spates, knocking him down. Spates tried to return punches but missed and wound up back on the ground, where Washington inflicted a series of 10 or so hard kicks to Spates's head and body, before walking off and leaving him on the ground. Conwell stayed on the bench during this, telling Spates to chill and stay down. Washington returned and inflicted another round of kicks, until Johnson called out, "Hey, that's enough." Spates was so drunk he could not defend himself. Then Conwell rose, got a crutch from Cox and "pressed it over [Spates's] throat." Kneeling over him, with a hand on each side of the throat, Conwell leaned his weight forward on the crutch and "pressed on his larynx" for a minute or more, saying something about having to "help Mario [Washington]." After Conwell rose, Spates lay still, but Johnson heard him breathing, "maybe a little raspy," as Johnson headed off toward his sleeping spot. After a minute or so, Conwell returned and pressed the crutch over Spates's throat again, only longer this time. When Johnson later looked back over a wall from his sleeping spot 70 to 75 feet away, he saw Conwell dragging Spates to the "lake." He did not

4

see Washington at that point.

### 3. Kenneth McGuffin ("McGuffin")

McGuffin was employed but, like Johnson, sleeping and hanging out in Peralta Park. He had arrived at the BART station near the park, and met Cox, who was on crutches. Together, they walked to the park where McGuffin, wanting to sleep, was distracted to find that his and Johnson's sleeping gear were gone. It was 11 p.m. or later, and Spates, Johnson, Washington and Conwell were also at the park. As McGuffin approached, Spates came up to him, drunk, swaying "like a palm tree in a hurricane," and wanting $15 dollars McGuffin owed him. McGuffin didn't have the money and told him so; Conwell grabbed Spates's arm and told him to sit down and leave McGuffin alone. McGuffin left to buy beers, and afterward went to a dumpster where he found his sleeping gear. He paid no attention to what was going on with the group and couldn't have seen them from the dumpster, but as he climbed out of it he heard an altercation between Washington and Spates. Walking back to the group, he saw Spates on his hands and knees, and Washington kicking him, saying, "Get up, get up." Each time Spates tried to rise, Washington kicked him some more. Spates was too drunk to defend himself, and Washington kicked so hard it was "like watching Ray Wersching kick a field goal." Spates took over 10 kicks in all, to the body, shoulders, and head. McGuffin called out for Washington to stop, saying, "You know the man is drunk. Why don't you leave that man alone." Washington kept kicking, and Conwell said from his bench near Johnson, "Man, leave it alone, Ken, you don't know what [it]'s about." McGuffin said, "Fine," and, nervous about police contact, told Johnson, "Man, I'm outta here, they're gonna kill this boy."

As McGuffin left, Spates lay on his back and seemed to be alive; Spates had moved his "hands and legs," at least until "the alcohol finally won over." The last McGuffin saw, Washington and Conwell were on each side of Spates, as if "trying to help him get up."

### 4. Lee Patton ("Patton")

Patton was employed, and was homeless by choice and slept in Peralta Park. He knew Spates, Washington and Conwell. About a week after learning of Spates's death,

5

Patton encountered Washington watching a basketball game in Peralta Park. As Patton

went to leave the park, Washington, who was limping, asked to borrow $5. Patton said he

didn't have it but would give it to him when he came back through the park. Then

Washington added, "Lee, I have something to tell you" and asked him not to tell. He said

that "Danny [Spates] came to the park talking a lot of shit, and he fired on" (hit) him, and

that "both him and Demetrius [Conwell] began hitting him and kicking him," with

Washington throwing the first punch. Washington said he "hurt his foot by kicking Danny."

Then using the plural pronoun "we," Washington said they "grabbed Larry Cox's crutch,"

"hit him" with it, "drug Danny down to the creek," and "put him on the side of the beach and

he was living, he was gasping for air." Patton, wanting to hear no more, said so and left.

Months later police officers interviewed Patton. When Patton told them what

Washington had said and that he didn't know anything more than that, this didn't seem to

satisfy them. The police officers said they had information that he was there, and they

might have the district attorney charge him as an accessory. Frightened, Patton lied and

made up a story comprised of conversations with Cox and McGuffin and other "talk going

on in the park." In a 12-minute taped statement he told them he entered the park, heard

Washington and Conwell cussing at someone and saw them swing at, and hit and kick

someone on the ground "on his head, body, side, ribs, whatever." He said he heard

someone say to cut that out and then saw Washington and Conwell drag someone. After

awhile, he thought he heard "some splashing in the water."

The story was untrue, Patton testified, because he never saw the altercation.[5] The

truth, Patton further testified, was that he ended up tired and drunk at Peralta Park around

11 p.m., found Johnson asleep, drank with him and then went to sleep, either nearby or at

a motel. He first heard from sheriff's deputies, after Labor Day, that a body had been found

with a "crushed larynx" and, later, that it was Spates. Washington made his admissions to

Patton shortly after that.

---

[5]Patton's denial of his presence at the scene was consistent with other witnesses, none of whom said they saw him there except for Cox, who said "maybe Lee" was there.

6

### 5. Paul Herrmann, M.D. ("Dr. Herrmann")

Forensic pathologist Dr. Herrmann performed an autopsy on Spates's body on September 5, 2000, the day after its discovery. He also examined photographs taken when the body was recovered from the water and somewhat less decomposed, and he had laboratory tests done on bodily fluids. The body was in an advanced state of postmortem decomposition, with "skin slippage [sloughing] in many areas," discoloration of the skin, and skin wrinkling consistent with four days' immersion in salt water. External examination showed a contusion around the right eye, cheek and upper mandible, which were swollen and discolored, as was confirmed by internal examination. Contusions also appeared on the scalp, consistent with kicking or hitting, and there was hemorrhaging at the larynx.

Internal examination confirmed bruising to the hyoid bone, near the larynx, and a fracture of the superior thyroid horn, a small bony structure on the larynx about half to three-quarters of an inch long and less than a pencil width. The most delicate of all parts of the larynx, the structure extends from beside and behind the protruding upper part of the larynx back deep into the neck. The area is protected by being above the breastbone and under the chin, but Spates's was broken at the cartilage base on the left side, an injury common in strangulation and caused by constant, severe pressure being applied. Such an injury might also be caused by a severe kick or blow, but Spates had none of the expected localized hemorrhage in the soft tissue under the skin surface to support that hypothesis. Herrmann could not "completely rule [it] out" though, because a severe blow with an instrument or body part of sufficient size and smoothness might fracture the structure without leaving a bruise. It would take a lot of force to fracture the horn in an adult male, but someone of Conwell's weight kneeling over the body and pressing on the neck with a crutch "would certainly do it."

The larynx is a rigid structure that helps keep the airway open so that one can properly breathe and pass air over the vocal chords to make sound. Pressure on the neck sufficient to fracture the superior thyroid horn carries life-threatening risks of blocking

7

airways, occluding blood flow to and from the brain and possibly even interfering with the vagus nerve, which controls heartbeat. The fracturing of the horn structure also carries life-threatening effects after the strangulating pressure is removed. Partial loss of rigidity from the breakage partially occludes the airway, although generally not enough to cause respiratory failure. Also, the injury is extremely painful, and the body reacts as if something were going down into the airway. The larynx goes immediately into laryngo-spasm, where the vocal cords come together in a spastic fashion, closing off that space between them (the glottis) so that the victim has "great difficulty" trying to talk or move air. Any breathing is noisy and any speech "very hoarse."

Laboratory testing revealed a blood alcohol level of .35 percent, which could be a fatally high level in some people, but the passage of time and condition of the body made this an unreliable gauge of Spates's intoxication at death. The process of decomposition itself causes production of alcohol from bacteria in the blood and body tissues. This alone would typically account for .12 to .15 percent but could range as high as .35, thus leaving Herrmann unable to say whether Spates had any alcohol in his system when he died. Even attributing just .15 to the decomposition, the difference of .20 would render most people "badly intoxicated" but not unconscious, even considering the added effect of cocaine also detected in his system.

Cocaine was detected in Spates's blood at .07 micrograms per milliliter; cocaine metabolite benzoylecgonine was detected in his urine at .18. This showed cocaine ingestion within six hours of death but was a "very low level" typical of anyone who ingests cocaine. It did not show serious intoxication and was "certainly" not a cause of death. Even a level twice or three times as high would not have been a cause of death. Dr. Herrmann found "with medical certainty" that Spates's cocaine ingestion "had nothing to do with his death." Only in conjunction with severe heart disease, extreme exercise or other factors not apparent in Spates would such cocaine ingestion have produced or caused cardiac arrhythmia or heart attack.

Spates's heart, at 460 grams, was moderately enlarged, but Dr. Herrmann found no

sign of atherosclerosis, scarring from a past heart attack, or any other coronary or arterial disease.  A dying person can produce a "death rattle" that laymen might mistake as a brief gasping for air or choking, but it would take a greatly enlarged heart (500 to 600 g), plus severe hypertension or other coronary or arterial disease, to create a fatal ventricular fibrillation or heart attack causing death.  An enlarged heart (over 400 g) could be caused by long-term chronic use of cocaine, but Spates's enlargement was not great, especially given that some enlargement is common in black men generally, as is hypertension, which is another possible cause of enlargement.  In Dr. Herrmann's view, it was not possible that Spates died of a heart attack.  One might suffer a heart attack as the result of a severe beating, for example, but that would make the beating, not the heart attack, the cause of death.

Dr. Herrmann opined that the cause of death was blunt trauma to the neck, face and scalp.  Herrmann could not be sure of the "exact mechanism" of the injuries, such as the means of inflicting blows or the order of blows and the neck injury.  The blows to the face or the back of the head could have caused unconsciousness, making it easier to strangle Spates or cause loss of the gag reflex so that he would be asphyxiated by his tongue occluding his airway, or perhaps have drowned when placed in the water.  There was no sign of concussion, but concussion does not usually leave "a demonstrable lesion" visible from autopsy.  The neck injury was described as blunt force trauma to the neck, rather than strangulation, because an absence of fingernail marks or other such definitive evidence left it uncertain "how the force was applied."  Dr. Herrmann did not "know what the scenario was," but was certain that trauma to the neck contributed significantly to Spates's death, even if someone had knocked him out and thrown him in the water afterward.  The neck compression and bone fracture would pose "a very severe problem for anyone" and could have been a sole or contributing cause of death.

Dr. Herrmann had begun his autopsy expecting a drowning, knowing the body was found floating in the water, but then found head and neck injuries and deemed them to be the causes of death. Those findings, however, did not rule out drowning as "the final thing

9

that finished him," and Dr. Herrmann could not tell whether Spates might still have been alive when placed in the water. He found fluid in the lungs but could not tell whether any of it had been inhaled or, rather, whether it was all produced through decomposition. There was no aquatic life or material in the stomach, but if Spates did drown, his injuries were enough alone to have rendered him unable "to care for himself" in the water. The injuries were also enough alone to have killed him.

**B. Defense Case**

Defendants opted for what counsel described to the trial court as "a joint defense." It portrayed Spates as an aggressor, and Washington and Conwell acting defensively or nonmaliciously. Washington did not testify; Conwell did.[6]

**1. Conwell**

Conwell met Spates at a mental health facility Conwell attended for suicide counseling. They hit it off, and Spates became his best friend. Spates was a guy "you would die for, go the extra mile for, put your life on the line for, go the extra mile for, do anything for." Spates had mental problems but was "not slow."

Conwell used marijuana and drank beer but did not care for hard liquor or use cocaine. Spates used crack cocaine – daily if he had the money – and drank alcohol and took various pills. Spates was nice and mellow when sober but, when drinking, drank heavily and got crazy, "like a madman." Conwell would calm him down by talking to him.

Conwell met Washington more recently, and they became friends, though not as close as Conwell and Spates were. Washington drank and used crack cocaine; people said that he engaged in homosexual acts for money.

Sometime after 4:00 p.m. on August 31, 2006, Conwell was at a pizza place when Spates came by and asked if Conwell wanted to "kick it." Spates bought alcohol with a $20

---

[6]In addition to the testimony and evidence discussed below, Conwell also offered two witnesses who testified that Conwell had broken up fights between homeless men in the past, and three witnesses who testified about prior violent acts by Spates. Additionally, a witness offered by Conwell testified, apparently unexpectedly, that Spates was not violent.

bill and gave Conwell $10 change to buy marijuana.  Conwell bought some, and they walked back toward Lake Merritt, on the way meeting two guys from East Oakland.  Spates said he used to stay with them and that they thought he owed them rent, but the men gave them no trouble.  Conwell and Spates walked on to the lake.  They got to Peralta Park after stopping once for Conwell to smoke a joint and Spates to drink a bit.  For the next two or three hours, Conwell sat smoking, and Spates and Washington drank.  Around 4:30 or 5:00 p.m., Spates announced he was going to the bank to get money to buy crack.  Washington said he was hungry, and all three walked in the direction of an ATM.  At a BART station, Washington saw two girls he knew, and Spates continued on his own.  When Spates returned 25 to 30 minutes later, they all walked back to the park.  Spates and Washington went off to buy crack.  Spates later made second and third crack runs alone, bringing back more beer on his second run.  Conwell kept smoking weed and "was getting high," as was Washington, from crack.

Those present in the park now included Conwell, Washington, Spates, and acquaintances Johnson and Cox.  When McGuffin arrived, Spates aggressively "rushed" him, asking for "the $15 that you owe me," but Conwell said, "[J]ust relax, calm down, man." McGuffin left.  Everything was "cool" as the group sat talking, but trouble arose when Spates, referring to Washington, said, "I'm not the only guy here who doesn't like girls," and loudly charged him with being homosexual.  Conwell, Washington and others urged Spates to "be cool," but he persisted, "just out of control."  Washington stepped back as Spates came at him, and then pushed Spates away.  Spates fell but came back to grab him around the legs.  Washington kicked to get away, and then a full fight broke out between them, Spates grabbing at Washington, Washington kicking at Spates some more and Spates even lunging or swinging at Conwell, who was trying to calm him.

The first skirmish ended quickly, as Conwell urged Spates to be cool and sat him down on a bench.  Spates remained combative, rising to struggle with Conwell and demanding that Conwell leave him alone so he could fight Washington.  Spates grabbed a piece of sprinkler pipe from the ground and swung it at Conwell, who said he didn't want to

fight and tried to calm him.  Cox took his crutch and handed it to Washington, to "make the fight even," and Conwell then took it when Washington urged:  "D, use the crutch.  Defend yourself."  Spates threw the pipe at Conwell, who then pushed Spates down with the crutch and held it sideways across his chest.  After 30 to 45 seconds, Spates agreed to "be cool."  Conwell let him up and laid the crutch down.  As Conwell sat down, Spates lay there "for a little while" and was "gagging or choking."  While gasping for air, Spates said, "I'm going to get you."  Spates rose to his feet, still wanting to fight and still saying he had seen Washington with "gay people" and "by gay bars."

Spates came again at Washington, who was "pissed" by then and fought back, this time pushing Spates to the ground and "kicking him and kicking him and kicking him."  As Spates was "defending himself" on all fours, unable to rise against the kicks, Johnson arrived and repeatedly ordered Washington to stop.  Washington stopped, and Spates lay motionless "in a weird position," partly on his back.  There was "a lot of blood" – "a mess."  Spates had blood on his face, was bleeding from the mouth area, and was bruised.

Conwell grew concerned.  He went over to Spates, shook and called to him, and got no response or movement.  Spates was limp.  Conwell checked for pulse, listened for a heartbeat and checked for breathing, but found none.  He lifted Spates, and sat him on a bench; Spates fell over.  Conwell lay Spates back on the ground and told Cox he thought Spates was dead.  Spates did not gasp or choke now; he was just "out."  Conwell thought of calling an ambulance, but people argued the police would come and never believe "it was just a fight and the guy died."  Someone suggested taking Spates to the water, that he might "come to" with cold water on him.  Conwell decided to move the body to the water.  Conwell gathered up things he thought had fallen out of Spates's pockets and put them back.  Nobody tried CPR; Conwell explained, "We knew he was dead – no pulse, no heartbeat."  Yet, not being "a medical doctor," Conwell kept "hoping" that Spates was not dead.  Asked what Spates did at the end, Conwell said:  "After the last part of the kicking he didn't do anything.  He was just laying there."  As to not calling an ambulance, he repeated, "We thought he was dead."

With Washington's help for the first few yards, Conwell dragged the body to the water's edge leading to the estuary, and left it on the mud.  During the dragging Spates's pants had slid down, and Conwell tried to pull them back up.  He "knew [Spates] was dead" but put one of Spates's arms in the water "just hoping" it might revive him.  Conwell sat alone with the body for about 30 minutes, feeling angry and sad, then left and slept for several hours.

The water had been "really low" when Conwell left but had risen upon his return hours later.  The body was gone.  He learned days later that a body was found in the estuary and mentioned this to Washington.  They heard later that Spates "died of a crushed larynx."  Conwell, though not convinced, was "afraid that [he] might have" done it with the crutch and so did not mention to police that he had used a crutch across Spates's chest area to hold him down.  He made up a story that there had been a fight just between himself and Spates and that he had done the kicking.  "Bad experiences with the police" led him to lie and cover up.  He wanted to "take all the blame" for himself because it was "an accident," and Washington was "a pal" of his.

## 2. Jaime Cortes, M.D. ("Dr. Cortes")

Dr. Cortes had renewed Seroquel prescriptions for Spates at a walk-in clinic in Oakland since February 1999, when Spates first came in saying he needed the drug to help him sleep.  Dr. Cortes had treated Spates for respiratory and other ailments over the years.  Dr. Cortes did not check with the doctor who originally prescribed Seroquel to Spates, and, being unfamiliar with the drug, read about its use for psychosis and, before renewing it, learned from a pharmacist that it was used for insomnia.  He renewed it 14 times, the last time 30 days before Spates died.  Dr. Cortes did not feel qualified to diagnose psychosis but, in seeing Spates 24 times over the years, never saw any signs of psychosis.  Spates complained of being depressed but never of hearing voices.

## 3. Fred Rosenthal, M.D. ("Dr. Rosenthal")

Forensic psychiatrist Dr. Rosenthal, who had not treated Spates, testified that Seroquel is used to treat psychotic patients with illnesses like schizophrenia and

13

schizoaffective disorder, is nonaddictive, and has potentially dangerous and "definitely unpleasant" side effects. A patient who stops taking antipsychotic drugs might experience insomnia along with a relapse into psychotic symptoms. A schizophrenic with paranoia might lash out at those he thinks are plotting against him, and may manifest personality shifts that might popularly be called "Dr. Jeckle-Mr. Hyde" shifts. Consuming alcohol or cocaine may interfere with the efficacy of antipsychotic drugs, but alcohol and cocaine may themselves produce violence and psychosis.

### 4. Raymond Kelly, Ph.D. ("Dr. Kelly")

Forensic toxicologist Dr. Kelly put the likely range of cocaine in Spates's system higher than Herrmann had. Accepting Herrmann's laboratory results, Dr. Kelly placed the likely cocaine level at death as between .07 and .25 and possibly higher. At .07, one would be intoxicated for driving purposes; a .25 level was "a very typical" level for someone under its influence. No Seroquel was detected, but this was inconclusive because the screening test was designed to detect drugs of abuse and would detect high levels, not therapeutic levels.

Dr. Kelly testified briefly about the pathology of cocaine use, while stressing that he was not a physician or pathologist, and that his role as a laboratory director was not to assess a cause of death, but to provide information to forensic pathologists for that purpose. According to Dr. Kelly, death triggered by cocaine use, short of some heart tissue damage in chronic users, often "doesn't leave any pathological signs" evident through autopsy. Generally, however, cocaine use constricts coronary blood vessels, increasing heart rate and blood pressure and increasing the need for oxygen. In other words, increased use affects the heart. Also, cocaine can have effects on the heart "that catch up with you later," and "you may not even have cocaine in your system at the time you just keel over dead of some effect on your heart muscle that's been produced by prior cocaine use." Dr. Kelly stated "that didn't happen in this case, to [his] understanding at least."

//

//

14

## C. Rebuttal

Detective Loman related statements Conwell gave to him on December 18, 2000. Conwell first swore he never saw the altercation, saying he joined Spates that day, asked him for marijuana, walked with him to the lake and, on the way, joined two East Oakland guys Spates knew and with whom Spates had a problem; Conwell claimed he stayed behind the other three until reaching the park and that he left the park before any fight. Confronted by the officers, Conwell then cried, and asked "how much time would he get for this" and gave an altered account, now admitting having beaten Spates. He said he was only trying to help Spates but that Spates lunged at him, prompting him to push Spates so that he fell. Conwell had "told him to be cool," but Spates rose up and "still wanted to fight." Conwell slapped him, but Spates persisted. They traded punches on the ground, and Conwell helped Spates onto a bench. Spates still wanted to fight, and Conwell punched him some more and "told him to be cool." Conwell "beat up" Spates, but didn't mean to. Conwell then heard McGuffin say, "Stop, you're gonna kill that dude," and Conwell walked away. Spates had blood around his mouth and "seemed to be out." Then Conwell decided, "Fuck this. I'm not going to jail for no assault," and tried to wake Spates up, but could not. When, after 10 or 15 minutes, Spates stirred groggily and made "gurgling sounds," Conwell turned him "on his side so he wouldn't choke on his blood." He thought about calling an ambulance but figured "they wouldn't believe him if he told them he didn't have anything to do with it." By now the original group of people was gone. Conwell checked for a pulse on Spates's neck and wrist, and also for breath, but found none. He grabbed Spates's body and, alone, "dragged him into the water." He told the interviewing officers, "I'll do the time, Daniel didn't do anything to me."

The officers interviewed Conwell a second time that same day to ask about the crutch and possible robbery. Conwell said that Washington "came after everything was over." Then he said Washington "was there but he only wanted to talk about what he [himself] did." Conwell denied using a crutch to hit or hold Spates down, and he said he thought Spates had about 20 bucks on him and was "waiting for payday."

15

A third interview occurred that evening at Conwell's instigation. He said he was ready to tell the entire story without omitting anything – about his own and another person's involvement. But by the time the tape machine was on, he said he did not want to talk about anyone else's involvement, "only his, and that he would think about it" and decide later if he wanted to say more.

## DISCUSSION

A district court may grant a petition challenging a state conviction on the basis of a claim reviewed in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See 28 U.S.C. § 2254(d). "[I]t is the habeas applicant's burden to show that the state court applied [clearly established federal law] to the facts of his case in an objectively unreasonable manner." Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

Conwell argues he is entitled to relief on a number of grounds, which the Court considers in turn.

### A. Instructions

Conwell argues "the jury was not adequately instructed on the elements of the crime of conviction," (see Petition at 13:5-6), which, as noted, was involuntary manslaughter. Specifically, Conwell argues the jury was not instructed that causation is an essential element of involuntary manslaughter, was given an incorrect instruction as to proximate cause, and was given an incorrect instruction as to the element that the defendant commit an act dangerous to human life.

### 1. Causation As Essential Element

The trial court, after instructing the jury as to murder, gave the following instruction:

Lesser to murder are voluntary manslaughter and involuntary manslaughter. I'm going to instruct you on what the elements of those offenses are. The crime of manslaughter is the unlawful killing of a human being without malice

16

aforethought. It is not divided into degrees but is of two kinds, namely, voluntary manslaughter and involuntary manslaughter.

(See Ex. 2 at 2062.)[7]

After next instructing the jury as to voluntary manslaughter, including an instruction that a conviction for voluntary manslaughter required a finding "the perpetrator's conduct resulted in the unlawful killing," (see Ex. 2 at 2063), the trial judge gave CALJIC No. 8.45, which defines involuntary manslaughter:

> Every person who unlawfully kills a human being without malice aforethought and without an intent to kill and without conscious disregard for human life is guilty of the crime of involuntary manslaughter, in violation of section 192(b).
>
> There is no malice aforethought if the killing occurred in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury.
>
> A killing in conscious disregard for human life occurs when a killing results from an intentional act, the natural consequences of which are dangerous to life, which act is deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for human life.
>
> A killing is unlawful within the meaning of this instruction if it occurred:
> 1. during the commission of an unlawful act not amounting to a felony which is dangerous to human life under the circumstances of its commission; or
> 2. in the commission of an act ordinarily lawful which involves a high degree of risk of death or great bodily harm without due caution and circumspection.
>
> An unlawful act not amounting to a felony consists of a battery, a violation of Penal Code section 242.
>
> The commission of an unlawful act without due caution and circumspection would necessarily be an act that was dangerous to human life in its commission.
>
> In order to prove this crime each of the following elements must be proved:
> 1. a human being was killed; and
> 2. the killing was unlawful.

(See Ex. 2 at 2066-67.) Thereafter, the trial court read a number of other instructions, some of which, as discussed below, pertained to involuntary manslaughter.

In the Court of Appeal, Conwell, focusing on the last paragraph in CALJIC No. 8.45, argued the trial court erred by failing to instruct the jury, in said instruction, that causation

---

[7]Exhibit 2 is the Reporter's Transcript, which is attached to respondents' answer.

17

was a required element. The Court of Appeal rejected Conwell's argument, finding that, although CALJIC No. 8.45 did not expressly reference causation as an element, other instructions read to the jury after CALJIC No. 8.45 did advise the jury that the jury had to find Conwell's acts caused Spates's death in order to convict Conwell of involuntary manslaughter, specifically, CALJIC No. 8.55, which, as read to the jury, stated, "To constitute murder or manslaughter, there must be, in addition to the death of a human being, an unlawful act which was the cause of that death." (See Ex. 2 at 2069.)[8] The Court of Appeal further rejected Conwell's argument for the reason that the issue of whether Conwell's use of force was a cause of Spates's death was the central focus of Conwell's closing argument. The Court of Appeal, in addition to summarizing the closing argument,[9] quoted Conwell's counsel's argument that, "My favorite [instruction] is 8.55," which counsel correctly stated to the jury required that "there must be, in addition to the death of a human being, an unlawful act which was a cause of that death." See People v. Conwell, 2004 WL 505240, at *20.

Conwell argues the Court of Appeal's finding is contrary to or involved an

---

[8]In addition, the Court of Appeal identified CALJIC No. 8.58, which as read to the jury, stated:

If a person unlawfully inflicts a physical injury upon another person and that injury is the cause of the latter's death, that conduct constitutes an unlawful homicide even though the injury inflicted was not the only cause of the death.

Moreover, that conduct constitutes unlawful homicide even if:
1. the person injured had already been weakened by disease, injury, physical condition or other cause; or
2. it is probable that a person in sound physical condition injured in the same way would not have died from the injury; or
3. it is probable that the injury only hastened the death of the injured person; or
4. the injured person would have died soon thereafter from another cause or causes.

(See Ex. 2 at 2069.)

[9]The Court of Appeal summarized Conwell's closing argument as follows: "Spates's own actions set in motion the chain of events, that neither defendant's use of force was fatal, and that the death was unexpected and, consistent with Dr. Kelly's testimony, probably caused by an enlarged heart overloaded by the combined stresses of alcohol, cocaine, perhaps Seroquel, and the fight." See People v. Conwell, 2004 WL 505240, at *20.

18

unreasonable application of federal law clearly established by the United States Supreme Court. Specifically, Conwell relies on In re Winship, 397 U.S. 358 (1970), for the proposition that a trial court's failure to instruct on an essential element deprives the defendant of due process. See id. at 364 ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

The Court of Appeal's finding that the jury was, in fact, instructed that causation was an essential element is not a clearly unreasonable application of Winship or any other United States Supreme Court decision,[10] in light of the explicit instructions identified by the Court of Appeal that advised the jury the defendant's act must be a cause of the death, as well as causation being the focus of the closing arguments. See Henderson v. Kibbe, 431 U.S. 145, 153-54 (1977) (holding petitioner not entitled to habeas relief where trial court failed to explicitly identify causation as essential element for crime of second-degree murder, where counsel "stressed" causation in closing arguments and trial court read to jury statutory language requiring jury to find "defendant's conduct caused the death of another person").

Accordingly, Conwell has failed to show he is entitled to relief on his claim that the jury was not advised causation was an essential element of the crime of involuntary manslaughter.

**2. Proximate Cause Instruction**

The trial court gave the following instruction defining causation: "The criminal law has its own particular way of defining cause: A cause of the death is an act that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act, the death and without which the death would not occur. There may be more than

---

[10]Conwell also cites Francis v. Franklin, 471 U.S. 307 (1985), which addresses when "contradictory instructions," one of which can be understood as "impart[ing]" to the jury an unconstitutional understanding of the allocation of burdens of persuasion," give rise to a constitutional deprivation. See id. at 322-23. The instant case, however, does not involve "contradictory instructions."

one cause of the death.  When the conduct of two or more persons contributes concurrently to a cause of the death, the conduct of each is a cause of death if that conduct was also a substantial factor contributing to the result.  A cause is concurrent if it was operative at the moment of the death and acted with another cause to produce the death."  (See Ex. 2 at 2045-46.)

In the Court of Appeal, Conwell argued the trial court erred by failing to give, in addition to the causation instructions set forth above, a "specific instruction, sua sponte, on the doctrines of proximate and intervening causes."  (See Ex. 3 at 66).[11]  According to Conwell, if the jury been given such "specific instruction," the jury might have found Spates's death was caused by an intervening event for which Conwell was not responsible, which events Conwell identified as (1) "Spates's reengagement in the fight with Washington," (2) Spates's "sudden congestive heart failure," and/or (3) "the workings of the tide tables."  (See Ex. 3 at 68.)

The Court of Appeal rejected Conwell's argument.  First, the Court of Appeal, understanding Conwell was not arguing the above-quoted instructions, as given, were "incorrect as far as they went," found that "the lack of amplifying language" as to intervening causes was waived by Conwell's "failure to request it below."  See People v. Conwell, 2004 WL 505240, at *17 (holding "party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party had requested appropriate clarifying or amplifying language").  Second, the Court of Appeal found that the instructions given did not omit the element of proximate cause, because "language requiring an injury to be a direct, natural and probable consequence of a defendant's act necessarily refers to consequences that are reasonably foreseeable."  See id. at *17-18.  Finally, the Court of Appeal held the instant case did not involve any "odd facts" that might warrant clarifying instructions on proximate cause; as an example, the Court of Appeal stated that Spates's rising from the ground and restarting the

---

[11]Exhibit 3 is "Appellant's Opening Brief" filed by Conwell in the Court of Appeal; it is attached to respondents' answer.

1   fight was "not unforeseeable or extraordinary given that Spates was under attack."  See id.

2   at *19.

3          Conwell argues the Court of Appeal's decision was contrary to or involved an

4   unreasonable application of federal law as set forth in United States v. Gaudin, 515 U.S.

5   506 (1995).  In the portion of Gaudin on which Conwell relies, the Supreme Court stated

6   that the Fifth and Sixth Amendments "require criminal convictions to rest upon a jury

7   determination that the defendant is guilty of every element of the crime with which he is

8   charged, beyond a reasonable doubt."  See id. at 510 (citing Sullivan v Louisiana, 508 U.S.

9   275, 277-78 (1993);[12] see also id. at 522-23 (holding "trial court's refusal to allow the jury to

10  pass on the 'materiality' of [defendant's] false statements" violated defendant's Fifth and

11  Sixth Amendment rights because "materiality" was essential element of crime at issue).

12  Although not clearly expressed by Conwell, Conwell's argument appears to be (1) that the

13  Court of Appeal erred in concluding the jury was properly instructed as to proximate cause,

14  and (2) that the jury, in light of the improper instruction, did not consider whether there were

15  any unforeseeable intervening events following Conwell's use of the crutch.

16         As noted, the trial court instructed the jury that a "cause of the death is an act that

17  sets in motion a chain of events that produces as a direct, natural and probable

18  consequence of the act, the death and without which the death would not occur."  The

19  Court of Appeal's finding, that such instruction was sufficient to advise the jury that an act is

20  not a cause of a death if the act sets in motion an indirect or unnatural or improbable

21  consequence, is not a clearly unreasonable application of the principle set forth in Sullivan

22  and reiterated more recently in Gaudin.  Moreover, Conwell fails to show there is any error

23  in the Court of Appeal's reasoning it was not unforeseeable that Spates would continue to

24  fight with Washington after Conwell had held Spates down with the crutch.

25  _____

26         [12]Gaudin was issued after the Court of Appeal's decision herein.  Accordingly, the
    Court understands petitioner to be relying on the authority cited in Gaudin, specifically,
27  Sullivan, which, as cited by Gaudin, states:  "The prosecution bears the burden of proving
    all elements of the offense charged, and must persuade the factfinder beyond a reasonable
28  doubt of the facts necessary to establish each of those elements."  See Sullivan, 508 U.S.
    at 277-78 (internal quotation and citations omitted).

Additionally, although the Court of Appeal did not expressly state why Spates's alleged "sudden congestive heart failure" and/or "the workings of the tide tables" could not constitute unforeseeable events, the reasoning underlying such implicit findings is apparent from the record, and does not constitute a clearly unreasonable application of federal law. First, no evidence was offered that Spates, in fact, had "sudden congestive heart failure" and, in any event, it is not unforeseeable that Conwell's act of holding Spates on the ground by forcing a crutch down against either Spates's throat or chest might cause a life-threatening reaction. Second, assuming, <u>arguendo</u>, Spates's death was caused by drowning, it is not unforeseeable that the act of placing an unconscious person in a body of water at low tide would result in that person's drowning as the tides changed, if not before.

Finally, the Supreme Court has held that a jury verdict "will not ordinarily be set aside for error not brought to the attention of the trial court," even on direct appeal. <u>See United States v. Atkinson</u>, 297 U.S. 157, 159 (1936). Rather, "exceptional circumstances" must be shown, for example, that the errors are "obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings." <u>See id</u>. at 160. Here, Conwell fails to identify any "exceptional circumstances."

Accordingly, Conwell has failed to show he is entitled to relief based on his claim that the trial court erred with respect to instructing on the issue of proximate cause.

### 3. Dangerous Act Instruction

As noted, the trial court gave CALJIC No. 8.45, which defines involuntary manslaughter:

> Every person who unlawfully kills a human being without malice aforethought and without an intent to kill and without conscious disregard for human life is guilty of the crime of involuntary manslaughter, in violation of § 192(b).
>
> There is no malice aforethought if the killing occurred in the actual but unreasonable belief in the necessity to defend one's self against imminent peril to life or great bodily injury.
>
> A killing in conscious disregard for human life occurs when a killing results from an intentional act, the natural consequences of which are dangerous to life, which act is deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for human life.

22

A killing is unlawful within the meaning of this instruction if it occurred:
1.  during the commission of an unlawful act not amounting to a felony which is dangerous to human life under the circumstances of its commission; or
2.  in the commission of an act ordinarily lawful which involves a high degree of risk of death or great bodily harm without due caution and circumspection.

An unlawful act not amounting to a felony consists of a battery, a violation of Penal Code section 242.

The commission of an unlawful act without due caution and circumspection would necessarily be an act that was dangerous to human life in its commission.

In order to prove this crime, each of the following elements must be proved:
1.  A human being was killed; and
2.  The killing was unlawful

(See Ex. 2 at 2066-67.)

In the Court of Appeal, Conwell argued that the penultimate paragraph of CALJIC No. 8.45, the above-quoted instruction, "effectively negate[d] the 'dangerous act' element," (see Ex. 3 at 55), thereby removing an element from the jury's consideration, specifically, the element, set forth in the fourth of the above-quoted paragraphs and as applicable to the instant facts, that Conwell's use of the crutch was "dangerous to human life under the circumstances of its commission."

The Court of Appeal rejected Conwell's argument, relying on the following instruction, CALJIC No. 8.46, given by the trial court to define "without due caution and circumspection":

The term 'without due caution and circumspection' refers to negligent acts which are aggravated, reckless and flagrant and which are such a departure from what would be the conduct of an ordinarily prudent, careful person under the same circumstances as to be contrary to a proper regard for human life or danger to human life or to constitute indifference to the consequences of such act.  The facts must be such that the consequences of the negligent acts could reasonably have been foreseen and must also appear that death or danger to human life was not the result of inattention, mistaken judgment or misadventure, but the natural and probable cause of an aggravated, reckless or grossly negligent act.

(See id. Ex. 2 at 2067.)  The Court of Appeal also found the jury's express finding that Conwell used a crutch in the commission of the involuntary manslaughter necessarily meant the jury found that Conwell broke Spates's larynx with the crutch and, in light

23

thereof, held "[i]t is impossible to conclude that the absence of clearer instruction on the dangerousness of the battery had anything to do with the result." See People v. Conwell, 2004 WL 505240, at *28.

Conwell argues the Court of Appeal's finding is contrary to or involved an unreasonable application of federal law clearly established by the United States Supreme Court, specifically, Sandstrom v. Montana, 442 U.S. 510 (1979). In Sandstrom, the Supreme Court considered an instruction that provided: "[T]he law presumes that a person intends the ordinary consequences of his voluntary acts." See id. at 512. The Supreme Court held that when given in a case where "intent" is an element, the instruction is unconstitutional because it has "the effect of relieving the State of the burden of proof . . . on the critical question of [the defendant's] state of mind." See id. at 521-24 (holding presumption improper where defendant charged with "deliberate homicide").

Here, unlike in Sandstrom, the charge in question does not involve an intentional killing. Further, as noted, the Court of Appeal found the jurors would have understood, from the instructions given, that in order to find a battery was committed "without due caution and circumspection," the jury was required to find the manner in which Conwell committed the battery was dangerous to human life under the circumstances of its commission. Conwell fails to demonstrate such finding constitutes an unreasonable application of Sandstrom.

Moreover, with respect to the Court of Appeal's alternative finding that any error was harmless, Conwell does not take issue with the Court of Appeal's reasoning that if he broke Spates's larynx with the crutch, any possible confusion created by the "absence of clearer instruction on the dangerousness of the battery" was harmless. Rather, Conwell argues that the Court of Appeal's harmless error finding is based on an unreasonable determination of the facts as found by the jury, i.e., that, contrary to the Court of Appeal's understanding of the facts, the jury did not find that he broke Spates's larynx. As noted, a federal court may grant a petition for a writ of habeas corpus if a state court's adjudication of a federal claim "resulted in a decision that was based on an unreasonable determination

24

of the facts in light of the evidence presented in the State court proceeding." See 28 U.S.C. § 2254(d).  Further, where, as with the instant petition, a federal court is reviewing the propriety of a state court's finding that an error was harmless, the court "may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable."  See Fry v. Pliler, 127 S. Ct. 2321, 2326 (2007).  Here, the Court of Appeal's understanding of the facts as found by the jury is not unreasonable.  As noted, the jury expressly found Conwell used a crutch in the commission of the offense, two eyewitnesses to the altercation testified that Conwell pressed the crutch down on Spates's neck, and the pathologist who performed the autopsy determined that Spates's larynx had been fractured.

Accordingly, Conwell has failed to show he is entitled to relief on the asserted ground the trial court erred with respect to its instructions on the "dangerous act" element.

**B. Jury Questions**

Conwell argues the trial court erred by failing to properly answer two jury questions.

The two subject notes were submitted by the jury toward the end of the second day of deliberations, at 3:50 p.m.  See People v Conwell, 2004 WL 505240, * 21.

The first note read:

The charge, Battery 16.140 and the charge, Involuntary Manslaughter 8.45

Does the fact that a killing occurred render the charge Involuntary Manslaughter
                                                        or
Does that fact (alone) allow battery

(See Ex. 1 at 547.)

The second note read:

Can or does 16.140 apply due to the fact a human being was killed & knowing that 3.30 can apply to Battery 16.140?  ~~Because the belief that a defendant was not involved in the killing, even~~  If I know there was a killing, but I don't believe his actions resulted in the killing, for only 1 defendant.

(See Ex. 1 at 549 (strikeout in original).)[13]

---

[13]It appears that one juror wrote the first sentence, as well as the fragmentary second sentence up to and including the word "killing," and that a second juror wrote the third sentence and the portion of the second sentence after the word "killing."  (See id.)

25

The trial court advised the parties it intended to send the jury the following written response:

> You must decide the case for each defendant separately. The definition of battery was supplied solely to provide meaning to the language of the involuntary manslaughter instruction. A conviction of battery as to either defendant is not an option.

(See Ex. 2 at 2302.)

Counsel for co-defendant Washington requested that, instead, a different answer be given: "I would ask that the jury be instructed based on the whole question, 'Does the fact that a killing occurred render the charge involuntary manslaughter or does that fact alone allow battery?' That should be answered, 'A killing by itself without a causal connection does not render the charge involuntary manslaughter . . . .'" (See id.) The trial court responded that it did not understand the question to ask "Does the fact that a killing occurred render the charge involuntary manslaughter?," but, rather, that the first phrase was "connected to the next clause, 'or does that fact alone allow battery,'" (see Ex. 2 at 2303), and stated its proposed response would answer "the entire question," (see id.). Counsel for Conwell then suggested a "solution," specifically, that the trial court refer the jury to "that one-sentence instruction, 'in order for there to be murder or manslaughter, there must be the death of a human being caused by an unlawful act,'" (see id.), to which the trial court responded, "If they keep wondering about it I can do that also," (see id.). Thereafter, the trial court sent the jury the response it had prepared, (see Ex. 1 at 550), and the jury returned a verdict that afternoon at 4:35 p.m. See People v Conwell, 2004 WL 505240, at * 21.

In the Court of Appeal, Conwell argued that the jury was asking, in effect, that if they found Conwell had committed a battery, would they have to convict him of involuntary manslaughter, and that it constituted a deprivation of due process for the trial judge not to have responded that any battery had to be a cause of death in order for the jury to convict on a charge of involuntary manslaughter. Specifically, Conwell argued, the trial court should have responded to the jury's notes as follows: "If you don't believe (in fact, if you are not convinced beyond a reasonable doubt) that the defendant's actions caused the

26

'killing,' then you must acquit the defendant of all charges."  (See Ex. 3 at 63.)

The Court of Appeal found that, although the response suggested by Conwell "could have been helpful," the trial court did not err with respect to the response actually given. See People v. Conwell, 2004 WL 505240, * 22.  In so holding, the Court of Appeal provided four reasons:  (1) the trial court's response advising the jury to decide each defendant's case "separately" implicitly directed the jury to "separately decide whether each defendant's 'actions resulted in the killing,'" thus "affirm[ing] that causation was required," (see id.); (2) the overall instructions "unmistakably required causation," (see id.); (3) CALJIC No. 8.45, one of the instructions to which the jury itself referred, addressed causation by stating "a killing in conscious disregard for human life occurs when a killing results from an intentional act," (see id.) (emphasis in original); and (4) the temporal relationship between the response and verdict indicates the jury understood causation was required, (see id.).[14]

Conwell argues the Court of Appeal's decision constituted an unreasonable application of Bollenbach v. United States, 326 U.S. 607 (1946).  In Bollenbach, the Supreme Court reversed a conviction, where the trial court answered a jury's question with an incorrect statement of law, specifically, a direction to "presume" a fact on which the

---

[14]With respect to the fourth reason, the Court of Appeal explained:

Fourth, our federal high court has reasoned that where a record shows complete instruction, an adequate if incomplete response to a question, a jury not shy about asking the court for guidance, and a substantial period of time elapsing before verdict and without further inquiry from the jury, it is reasonable to assume that the jury had no further difficulty.  (Weeks v. Angelone (2000) 528 U.S. 225, 234-236, 120 S. Ct. 727, 145 L. Ed. 2d 727 [two hours of further deliberating].)  The time lapse here was 45 minutes minus whatever time it took to fashion the three-sentence response to the notes.  This was less than the two hours in Weeks, but the issue in Weeks was whether jurors weighed mitigating evidence, something that would have taken time.  Here, were we to accept defendants' dire premise that the jury understood the court's response to mean that causation was utterly unnecessary, there would have been no need for any further deliberations at all, much less 30 minutes or so, because resolving any debate on causation would have been deemed pointless.  We assume, rather, that jurors used the time to discuss and resolve causation.

(See id.)

27

prosecution had the burden of proof, and found the error was not harmless in light of the jury's having previously announced it was deadlocked and, after receiving the erroneous response, it convicted the defendant within five minutes. See id. at 609-15. Although the Supreme Court, in Bollenbach, did not explicitly state its holding was based on constitutional grounds, see id. at 614 (stating issue was "whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials in the federal courts"), the Supreme Court, in a later case, indicated its holding was so based. See Sullivan, 508 U.S. at 280; see also Chapman v. State of California, 386 U.S. 18, 44 (1967) (Stewart, J., concurring) (describing Bollenbach as involving an "instruct[ion] in an unconstitutional presumption").

Petitioner's reliance on Bollenbach is unavailing, because the trial court's responses to the jury's questions here did not direct or imply that the jury should apply an unconstitutional presumption. Further, to the extent Bollenbach is understood as setting forth the broader principle that "palpably erroneous" responses to jury questions are unconstitutional, see Weeks, 528 U.S. at 231 (referring to trial court's response to jury question given in Bollenbach as "palpably erroneous"), Conwell fails to show the trial court's response here was palpably erroneous, or, more specifically, that the Court of Appeal's decision that the response was not palpably erroneous constituted a clearly unreasonable application of Bollenbach.

Accordingly, Conwell has failed to show he is entitled to relief based on the trial court's responses to the jury's questions.

**C. Ineffective Assistance of Counsel**

In a petition for a writ of habeas corpus filed in the Court of Appeal, and heard at the same time as his direct appeal, Conwell argued his trial counsel, William P. Cole ("Cole"), was ineffective because Cole did not consult with an "independent pathologist" or call such expert at trial. (See Ex. 4 at 7.)[15]  In support of this assertion, Conwell offered a declaration

---

[15]Exhibit 4 is the "Petition for Writ of Habeas Corpus" filed by Conwell in the Court of Appeal; it is attached to respondents' answer.

from Robert Anthony, M.D. ("Dr. Anthony"), a forensic pathologist, who stated that if he had been called at trial, he would have testified that "there was no evidence sufficient to convince [him] to a reasonable medical certainty that any specific cause of death could be assigned in this case," and that the "single most likely" among "many possible causes" was that Spates died of a heart attack. (See Ex. 4, Anthony Decl. at 2 (emphasis in original).)

Additionally, Conwell offered a declaration from Cole, who stated that "[i]t appeared to [him] that the examining pathologist – Dr. Paul Herrmann – never really established what caused the death, and [trial counsel's] investigation lead [sic] [him] to believe that the most likely cause of Spates' death was a heart attack brought on by a combination of his (pre-existing) enlarged heart, his ingestion of crack cocaine and alcohol, and the exertions of the fight that he started with the co-defendant, Mario Washington." (See Ex. 4, Cole Decl. at 1.) Cole explained he did not consult with an independent pathologist, nor call one as a defense witness for the following reasons:

> I thought it unnecessary to do so, given that the prosecution's own pathologist (Dr. Herrmann) was unable to say more than that it was 'possible' that Spates had died of drowning, strangulation, or any other means potentially inflicted by Conwell. (Also, another forensic pathologist would be hobbled by the fact that, unlike Dr. Herrmann, he could not examine Spates' body.)
>
> I believed that I would be able to get what we needed – that is, to expose the weakness of Dr. Herrmann's conclusion – through effective cross-examination. In additional, I did call an eminent toxicologist, Dr. Ray Kelley, whose testimony effectively countered Dr. Herrmann's regarding the extent and effects of Spates' intoxication.

(See Ex. 4, Cole Decl. at 1-2.)

Finally, Conwell offered a declaration from Doron Weinberg, an attorney who stated he has been qualified as an expert in the fields of attorney competence and ethics in criminal defense, and who offered the opinion that Cole's choice not to consult with or call as a trial witness an independent pathologist was "an unreasonable and unprofessional one." (See Ex. 4, Weinberg Decl. ¶¶ 5, 9, 17.)

The Court of Appeal denied Conwell's petition, for the reason that Conwell failed to show a "prima facie case for relief." See People v. Conwell, 2004 WL 505240 at * 42.

Conwell argues that the Court of Appeal's decision is a clearly unreasonable application of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Under <u>Strickland</u>, to establish ineffective assistance, the petitioner must shown that his "counsel's performance was deficient" and the "deficient performance prejudiced the defense." <u>See</u> <u>id</u>. at 687.

Here, as noted, Cole's strategy was to focus on cross-examination of Dr. Herrmann, whom Cole believed to be an unpersuasive witness on the issue of causation, and to call a toxicologist, Dr. Kelly, as a witness. As planned, at trial Cole did engage in a lengthy cross-examination of Dr. Herrmann and did offer Dr. Kelly as a witness. During his closing argument, Cole repeatedly argued that Dr. Herrmann's opinions as to the cause of death were insufficient to meet the prosecution's burden to establish causation. (<u>See</u>, e.g., Ex. 2 at 2164:19-26 (arguing Dr. Herrmann's testimony that "things probably happened, it wouldn't be enough"); Ex. 2 at 2165:20-23 ("Dr. Herrmann's testimony was not scientific testimony, it was a theory of the prosecution dressed up as medical testimony."); Ex. 2 at 2171:4-10 ("He gets up on that stand and testifies almost exclusively about the various possible manners of death . . . . He couches these all in possibilities. He even said at some point this suggests the possibility. You don't convict people of murder on suggestions or possibilities.").) Cole also argued that Dr. Kelly, who testified Spates had a higher level of cocaine in his system than the level set forth by Dr. Herrmann, was more credible that Dr. Herrmann with respect to analyzing the toxicology results, (<u>see</u> Ex. 2 at 2175:20 - 2179:11, 2184:24 - 2185:20), which argument supported Conwell's arguments that Dr. Herrmann was not credible and that a possible cause of death was a heart attack, caused in part by high levels of cocaine in Spates's system.

It was not a clearly unreasonable application of <u>Strickland</u> for the Court of Appeal to determine that Cole's strategic choices, specifically, Cole's decision to focus on cross-examination of Dr. Herrmann, to offer Dr. Kelly as a witness, and to base a major part of his closing argument on identifying what he perceived to be deficiencies in Dr. Herrmann's testimony, did not constitute ineffective assistance of counsel. Indeed, courts have concluded that similar strategic choices do not constitute ineffective assistance of counsel.

See, e.g., Hall v. Sumner, 682 F. 2d 786, 789 (9th Cir. 1982) (holding trial counsel not ineffective on account of asserted failure to pursue diminished capacity defense in murder trial, where counsel "successfully elicited enough information on cross-examination of the prosecution's expert to make a credible closing argument on the issue [of diminished capacity]"); see also Ellefson v. Hopkins, 5 F. 3d 1149, 1150-51 (8th Cir. 1993) (holding counsel's decision not to "call a medical expert to refute the State's serologist" in sexual assault case not deficient, where "trial counsel's strategy was to call into question the weight of the State's scientific evidence through his cross-examination of the State's expert"); Franklin v. Anderson, 267 F. Supp. 2d 768, 780 (S.D. Ohio 2003) (holding counsel's not hiring fingerprint expert not ineffective assistance in burglary/murder case, where counsel "adequately challenged [the fingerprint] evidence through the cross-examination of the prosecution witnesses").

Accordingly, Conwell is not entitled to relief on the ground of ineffective assistance of counsel.

### CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is hereby DENIED.

**IT IS SO ORDERED.**

Dated:  September 25, 2007

MAXINE M. CHESNEY
United States District Judge

31